11089

BOYD v. SOVEREIGN CAMP, W. O. W.

(115 S. E., 247)

INSURANCE—EVIDENCE OF EFFORTS TO PAY DUES TO AVOID SUSPENSION OF POLICY HELD SUFFICIENT FOR JURY.—Evidence of continued efforts to determine the amount of and pay dues on an insurance policy after a change in rates *held* sufficient for jury on question whether insured was rightfully suspended.

Before TOWNSEND, J., Laurens, April, 1921.   Reversed.

Action by Othella Boyd against Sovereign Camp, Woodmen of the World.   From directed verdict for defendant the plaintiff appeals.

*Messrs. Simpson, Cooper & Babb,* for appellant, cite: *Clerk of Local Camp was agent of defendant:* 1 Civ. Code 1912, Sec. 2770. *And his acts and representations are binding:* 102 S. C., 386; 116 S. C., 360; 112 S. E., 414. *Defendant estopped:* 113 S. E., 478. *Suspension of policy for non-payment improper:* 133 Iowa, 33; 123 N. Y. S., 59. *Camp cannot avoid waiver by stipulation in advance:* 90 Miss., 864. *Forfeiture not favored:* 156 S. W., 192; 35 App. D. C., 294.

*Messrs. Dial & Todd,* for respondent, cite: *Directed verdict proper:* 107 S. C., 291; 108 S. C., 177. *Secret agreement with local clerk not binding on Sovereign Camp:* 107 S. C., 291; 102 S. C., 386. *Payment of dues could not be waived:* 1 Civ. Code 1912, Sec. 2775; 107 S. C., 291; 108 S. C., 137; 102 S. C., 413; 113 S. E., 364; 263 Fed., 502. *By-laws as to waiver binding on insured:* 58 So., 100; L. R. A., 1915 E., 152; 4 L. R. A. (N. S.), 421; 183 U. S., 308; 180 Pac., 2; 40 S. W., 553; 174 Mo. App., 250; 142 Pac., 51; 69 N. E., 718; 141 S. W., 1055; 80 Atl., 157; 151 Mo., 552; 140 N. W., 1059; 93 Kan., 485; 87 Minn., 417; 188 S. W., 941; 155 Pac., 330; 139 Pac., 1138; 2 Kent., 296; Ang. & Ames on Corp'n., 110; Waits Actions and Defences, 366; 71 Ala., 436.

January 5, 1923.

The opinion of the Court was delivered by Mr. Chief Justice Gary.

This is an action on a policy of life insurance, and the appeal is from an order directing a verdict in favor of the defendant.

The record contains this statement:

"W. H. Boyd became a member of Sovereign Camp, Woodmen of the World, a fraternal life insurance corporation, on or about December 31, 1901, receiving a beneficiary certificate for $1,000. On or about December 30, 1909, his

insurance, on his application, was increased to $2,000, and his wife, Othella E. Boyd, plaintiff herein, was named as beneficiary in the beneficiary certificate issued on that day by the said Sovereign Camp, whereby it promised to pay her the sum of $2,000 at the death of her said husband after two years from the date thereof, conditioned as follows, amongst others:

"'(2) If the admission fees, dues, and Sovereign Camp fund assessments levied against the person named in this certificate (W. H. Boyd) are not paid to the clerk of his camp, as required by the Constitution and Laws of the order, this certificate shall be null and void, and continue so until payment is made in accordance therewith.' He was a member of Lithia Camp No. 215, located at Waterloo, S. C., though he resided in Alabama from 1909 up to within a few days of his death. Mrs. Boyd's brother, Mr. E. H. Anderson, had been paying Mr. Boyd's dues and assessments for a long time prior to the death of Mr. Boyd.

"Mr. Boyd died on February 25, 1920, survived by the plaintiff, the beneficiary named in his certificate. Proof of his death was duly filed with the proper officers of the defendant, and payment of the policy was refused. Thereupon, and within due time, this action was commenced in the Court of Common Pleas for Laurens county for the recovery of the amount claimed to be due under the certificate—$2,000, with interest, and $100 for monument."

At the close of the testimony, the defendant's attorneys made a motion for the direction of a verdict on the following grounds:

"First, That Mr. Boyd, the insurer, at the time of his death, on the 23d of February, 1920, was not in good standing as a member of the defendant order. His policy is therefore null and void, for the reason that he was suspended for nonpayment of his dues for December, 1919, and his dues for January, 1920.

"Second, That the insured was not legally reinstated, for he had not furnished a doctor's certificate to the clerk of the camp, had not provided a certificate that he was in good health and would remain in good health for 30 days, as provided in Section 66 of the Constitution and By-laws. He was not in good health at the time of his attempted reinstatement, and did not actually continue in good health for 30 days. He was suffering at the time from the disease which resulted in his death within the 30 days.

"Third, That the testimony shows no waiver of the resulting forfeiture."

The Court, after hearing arguments for and against the motion, ruled as follows:

"Mr. Foreman and Gentlemen of the Jury: The motion has been made for me to direct you to find a verdict in favor of the defendant. Under the view I take of the evidence that is before you, and the law applying to the case, I think it my duty to direct such a verdict.

"The Constitution and By-laws in evidence provide for the payment of monthly assessments on fixed dates stated in the By-laws, and provide that if any member fails to make such payment on or before the last day of the month, he shall stand suspended, and during his suspension his beneficiary certificate is void. It further provides that if he is suspended he may be reinstated upon making payment of the assessments in arrears, provided he is in good health at the time and shall continue in good health for 30 days thereafter.

"These are the material provisions of the contract between the Sovereign Camp of the Woodmen of the World and the members of the order, and they can't be waived by agreement of the local camp clerk with a member of the order to extend the time of payment beyond that fixed by the By-laws, where the agreement of such extension is unknown to the officers of the Sovereign Camp having power to bind the sovereign camp in such matters.

"For these reasons, and under the authority of the case of *Sternheimer v. O. U. C. T. A.,* 107 S. C., 291; 93 S. E., 8; and *Rabb v. N. Y. Life Insurance Co.,* 108 S. C., 137; 93 S. E., 711, I direct you to find a verdict for the defendant."

The appellant's exceptions are as follows:

"First, His Honor, the presiding Judge, erred, it is respectfully submitted, in directing a verdict for the defendant:

"(a) There being testimony that the dues and assessments for the month of December, 1919, for the insured, W. H. Boyd, were tendered to the defendant and refused by it before the insured was suspended.

"(b) The defendant received and retained the dues and December, 1919, and January, 1920, dues by informing the insured, by his agents, that it was not known what his dues and assessments were, and that he need not pay them till notified.

"(c) The dues and assessments of the insured, W. H. Boyd, were paid to and received by the defendant when the defendant gave notice of the amount thereof as it had agreed.

"(d) The defendant received and retained the dues and assessments for December, 1919, and January, 1920, levied and assessed against the insured, W. H. Boyd, and has not returned the same.

"(e) When the testimony shows that the beneficiary certificate of the insured, W. H. Boyd, was in full force and effect at the time of his death, all dues and assessments having been paid in accordance with notices from and agreements with the defendant.

"Second, Because it appears from the testimony that after the defendant had attempted to suspend the insured, W. H. Boyd, it received and retained all dues and assessments levied against him, and with full knowledge of existing conditions accepted ·his application for rerating on combined benefit

certificate rate (Option No. 5), and in consideration of the payment of such dues and assessments reinstated said insured and continued his certificate in full force and effect. And his Honor erred, therefore, in directing a verdict for the defendant.

"Third, Because his Honor erred in not submitting to the jury the questions as to whether the defendant had waived the provisions of its by-laws in reference to time of payment of dues and assessments by the insured, and in reference to insured being in good health at time of reinstatement, and continuing in good health for 30 days thereafter, there being testimony that such dues and assessments had been tendered to and refused by the defendant, and that defendant had agreed to notify the insured of the amount of such dues and assessments, and when they should be paid.

"Fourth, Because his Honor erred in holding that insured had not paid his dues and assessments for December, 1919, and January, 1920, when it appeared that defendant had checked on insured's brother-in-law, E. H. Anderson, for such dues and assessments for a number of years, and had agreed so to collect such dues and assessments, but failed and refused to collect same for said months, or to accept cash therefor when it was tendered for payment thereof, and waived payment thereof in December and January by continuing the time of payment till same should be demanded, and such payment was made on demand in February following."

J. P. Smith, a witness for the defendant, thus testified on direct examination:

"I live at Waterloo, and am clerk of Camp No. 215 of the W. O. W., there known as Lithia Camp, and was clerk in 1919. I knew Mr. William H. Boyd.

"Q. Did he pay you his dues for December, 1919? A. He was turned down on the January report for the December dues. The report goes off on the 5th of January for

December.   He was turned down on the 5th of January. The dues sent in on 5th of January are for December.

"Q. He didn't pay you his dues for December? A. That is why he was turned down.   I marked him suspended on 5th of January.   The dues for 1919 were $2.08, and 10 cents war tax.   *   *   *

"I made out and sent this report to Sovereign Camp on January 14th; supposed to send it on 5th.   Mr. Boyd's name appears amongst suspended members for nonpayment of the $2.08 and 10 cents war tax dues for December.

"Cross-examination:

"I became clerk in June, 1918.   Mr. Boyd was a member of the camp at that time, and his dues were paid by Mr. E. H. Anderson, a brother of Mrs. Boyd.   Mr. Anderson authorized me to draw a check on him every month for the dues, and I did that.

"When the December, 1919, payment came due, the Sovereign Camp notified me about a change in rates, and I did not draw a check for the December dues, because I had to notify the camp that the dues had been changed.   It developed later that the December dues had not been changed. Certain options were offered the members at that time with reference to changing their policies.   Mr. Boyd was not living at Waterloo at that time, nor since I had been clerk. The reason I did not draw a check for the December dues was that in January the new rates went in; I couldn't draw the check without notifying every member of the change and finding out whether or not they wanted it.   They had to sign up these options from 1 to 9.

"I did not present this blank to the Andersons.   They came to me, Mr. George Anderson did, came up the first of January and asked me what was the dues.   I told him I couldn't tell him; that I couldn't figure it out.   I wrote to some head man to come down and explain it to me.   I did not get the option blank signed in January.   They brought it back on the 14th of February.

"Mr. Boyd got to Waterloo on the 11th, I think, and in two or three days I got the option, and with it the December and January dues. I sent these to the head camp with others at the same time. The amount paid for Mr. Boyd was $2.18, and $5.51 for the month of January. I sent the head camp at that time some $50 which included payments for other members. * * *

"I received this notice form in January. I wrote and asked for it when I was confused about the rates. Mr. Anderson told me that as soon as I heard from the Sovereign Camp to let him know. All of them were wanting me to write about it. Circular letter offered in evidence. Exhibit 1.

"Redirect:

"The change of rates commenced January 1, 1920; 1919 dues were not increased.

"Q. The amount dues for December was the same as that paid in November? A. That is where I made the mistake. The change was not to be effective until January, 1920.

"Q. The new rates were adopted at the July meeting? A. I think so. I had a rate book. I thought the dues to be sent off in January were on the new rate. They were the premiums for December, but I thought I had to send off at the new rate. The book shows the amount sent off in January was for December, 1919. I understood that the dues for December, 1919, had been changed. I was confused about it. The premiums for January would be remitted in February. I was confused about the new rates and wanted them explained to me and the members.

"George and Ed Anderson lived at Waterloo, and I had an arrangement with Mr. Ed Anderson whereby I drew on him for Mr. Boyd's dues. I didn't write the Sovereign Camp about that arrangement. I did not check on him for the December dues, because I thought that the January 5th dues were raised. I found out later that the December dues were not raised. * * *

"I was confused over the December dues, but I found out later they were the same. I knew the dues would be the same when I made the report on the 14th of January. The reason I did not draw for Mr. Boyd's dues was that they told me to find out about the new rates for this first. I held over all who did not accept option 1, for which there was no change, until I could find out what option they would take, and what they would have to pay.

"Redirect examination:

"Q. Then why didn't you draw a check for Mr. Boyd's dues at that time? A. Because they told me to find out about these new rates. The Anderson boys asked me to find out what amount to pay before I sent it in, just like a lot of others."

TESTIMONY FOR PLAINTIFF IN REPLY

George Anderson, being duly sworn, testified:

"Direct examination by Mr. Babb:

"I am brother of plaintiff. Our brother, E. H. Anderson, had been paying Mr. Boyd's dues while he lived in Alabama. He stopped at Waterloo about the 11th or 12th of February on a visit, while moving to Whitmire to take up work. About the 1st of January, the clerk, Mr. Smith, notified me that there was going to be a raise in the rates. He said he didn't understand the rates and that he had invited Mr. Power to come down to help him straighten out the matter of rate. He told me that he was going to have a meeting the next night—that was about the first of January. I told my brother, who attended to Mr. Boyd's dues. He told me that he couldn't attend, and asked me to find out what I could about the dues at the meeting. I read the different options offered, and I thought option No. 5 best for Mr. Boyd. I took option 5 for him. I tried to pay the dues, but couldn't. I tendered it to the clerk, and he told me he couldn't take it because he didn't know the amount.

"By the Court: Q. How did you tender it to him? A.

I had the money there to pay him, offered it to him, and he said he didn't know what it was.

"Q. Did you offer any certain amount to him? A. I had the money in my hand.

"Q. Did you give it to him? A. I tried to. I had a $5 bill in my hand.

"Q. Did you offer to give him the whole $5? A. I had it. I expected to get back some change. He also said to me that I need not be in any hurry, because he had a letter from the Sovereign Camp saying that we had until March 1st to pay dues without being suspended. This was the 1st or 2d of January, at a special meeting held by the clerk in order to get some help in straightening out the rates.

"The old rate was $2.28, so I didn't expect it to be $5. He refused to take the old rate. I made the payment remitted February 18th. That is the first I knew Mr. Boyd was suspended. On the day before this payment was made, Mr. Smith, the clerk, told me, 'I think I got these rates and options straightened out.' This was on the 13th of February. I had offered on several occasions prior to that time to pay the January dues. I can't recall any particular occasion, and he had the authority to check on us to pay any amount. He did not during the month of January give me notice of the amount to be paid. On the 13th of February he told me he had it straightened out. I know the date, because I am going by the date on which I paid him. He notified me one day and I paid him the next. I don't know when he sent it off. I gave him a check for the dues after he told me what they were. Mr. Boyd was at Waterloo at the time.

"Cross-examination by Mr. Todd:

"The conversation with Mr. Smith was on the 1st, 2d, or 3d of January, in front of Wharton's store. I offered him the money at a meeting of the camp. I did not know the rates were raised in July, 1919. I am a member of the order. The conversation about the dues was at a special

18—S. C.—122

meeting at Woodmen Hall about the 1st of January, when I offered the clerk this $5. Don't know the day of the month. Had the money in my hand and offered it to him.

"Q. Did you want to pay the new rate? A. Yes, sir; new or old. I mentioned the new rate.

"Q. Did you mention the old rate? A. I told him I wanted to pay the dues. He said he didn't know what the amount was. I said, 'Can't you send the old rate and keep him from being suspended?' He said he couldn't. I signed the option blank that night.

"Q. Then you let things rock along until the 18th of February? A. I told him that if he wouldn't accept payment then, to let me know when he could.

"Q. You didn't have any conversation with him then until the 14th of February? A. I did.

"Q. On the 14th of February you saw him and signed this option? A. Yes, sir. * * *

"Q. This matter of the new rates was a right live question in your camp. You said you were discussing it in front of Wharton's store? A. No, sir. He said there had been a raise, or going to be a raise, and said some one had promised to come down and help straighten out the option at the meeting. I told E. H. Anderson about it, and he asked me to see after Mr. Boyd's dues for him."

E. H. Anderson, being duly sworn, says:

"Direct examination by Mr. Babb:

"I am brother of plaintiff, and live at Waterloo. I attended to payment of Mr. Boyd's dues to W. O. W., and had for nine or ten years. The clerk checked on me for nine and Mr. Boyd's dues in one check. There had been no default in payment of his dues for nine or ten years.

"Q. Coming down to December, 1919, state what you know of the payment of his December, 1919, dues? A. There was some disturbance over the change in the dues. They didn't understand the change and the amount.

"Questioned by the Court:

"Q. When was it you gave him $5 with which to pay Mr. Boyd's dues? A. About the 1st of January. I can't give you the exact date.

"Q. Was it after the 1st? A. It was right about the 1st.

"Q. Before or after the 1st? A. It was in January. I would not say the 1st or 2d, but it was right about the 1st of January. I can't be positive.

"Cross-examination by Mr. Todd:

"I had paid his dues for nine or ten years. Practically all the time by check. The clerk was to draw on my account. That arrangement was with the clerk. It was an accommodation on the part of the clerk. That way was convenient to me. He drew these checks on me during 1919.

"Q. How did you decide he was not going to draw one for December, 1919? A. Disturbance in the ——. Rates were going up. I knew that new rates had been adopted, but I didn't know what they were. The rates were changed at the July meeting, I had heard; I heard that they had been increased. I didn't drop my policy. Diln't pay any dues in January. I tried to pay them. I tendered them the money, and I said: 'Whenever you get the matter straight, you let me know. I want to pay Mr. Boyd's dues.'

"Q. Why did you give your brother $5 with which to pay his dues? A. If they got it straight at that meeting, I wanted to pay his dues. I had been requested by my sister to be sure to pay his dues. At the time I had an idea of quitting myself. Later on I went out, I had not decided to stay in. The clerk had not told me what the rates were. He told me he had not drawn on me for Mr. Boyd's December dues, because he did not know the rates. * * *

"Q. You didn't feel like relying on Mr. Smith? A. I didn't want him to draw on me for my dues. I didn't care about my dues, but I did want to keep Mr. Boyd's paid up. I had this talk with Mr. Smith right about Christmas. I was able to go to the meeting, but had a family I couldn't leave.

"Redirect by Mr. Babb:

"When I gave my brother the $5 to pay Mr. Boyd's dues with, I had practically decided not to stay in myself. That is why I gave him the money instead of letting him check on me. Later on I paid my dues. Stayed in till the camp got so that the old members could hold it together. I paid my dues some time the last of February or first of March. Put in application for new policy; sent the money and got it."

Plaintiff closed.

J. P. Smith, recalled for the defendant:

"Direct examination by Mr. Todd:

"I had been drawing checks on Mr. E. H. Anderson for Mr. Boyd's monthly dues. Did not draw for December, 1919, dues, and in January sent in report in which he was marked suspended.

"Q. Mr. George Anderson stated that he tendered you some money for Mr. Boyd's dues about the 1st of January? A. I don't know anything about that. If he did, I don't know it. The reason I marked Mr. Boyd suspended was that I had not received the December dues. I had a conversation with them about the raise. Mr. George Anderson did not at any time during the month of January offer me Mr. Boyd's December dues.

"Q. Did anybody else? A. Mr. E. H. Anderson asked me to let him know what the new rates were, for both himself and Mr. Boyd. He paid both. The arrangement was to draw on Mr. Ed Anderson for Mr. Boyd's dues. His option b'ank was first signed and left with me February 15th, I believe.

"Cross-examination by Mr. Babb:

"Mr. E. H. Anderson' asked me about the dues, and I told him I didn't know what they were. I told him that as soon as I found out what they were I would let him know.

"Q. Did you ever notify him? A. I can't tell you. I notified the camp that we had figured it out some way. I

didn't notify Mr. E. H. Anderson in person. The meeting was held about the 1st of January. Mr. Ed Anderson was not at the meeting. Mr. George Anderson was.

"Q. Mr. George Anderson asked you about the dues? A. We all tried to figure out the dues. We had our preacher there. All trying to figure it out. We didn't succeed. On the 14th I sent off all I had collected. I didn't know what the new rates were. I don't know that those who took the new rate came to ask me about them, but I couldn't have told them if they had. About the 18th or 19th of February I made my January remittance. My custom had been anywhere from the 5th up to the time when I got the dues. Don't think I was ever at late as the 20th.

"By the Court: The meeting was about the 1st of January before I sent in any dues."

It would be difficult to find a case in which there was a more persistent effort on the part of the insured to be allowed to pay his dues, and of less assistance on the part of the insurer enabling him to do so.

It is only necessary to cite the case of *Weathers v. Sovereign Comp, Woodmen of the World* (S. C.), 112 S. E., 44 (which had not been published when his Honor, the Circuit Judge, made his ruling), to show that there was error in directing the verdict in favor of the defendant.

Reversed.

Mr. Justices Fraser and Cothran concur.

Mr. Justice Marion concurs under the binding authority of the Weathers Case.

Mr. Justice Watts did not sit.